IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| S.D. AND T.D., | ) | Case No: |
| As Parents and Legal Guardians of | ) | |
| G.D., a Minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| MARYSVILLE EXEMPTED VILLAGE | ) | |
| SCHOOL DISTRICT BOARD OF | ) | |
| EDUCATION | ) | |
| 212 Chestnut Street | ) | |
| Marysville, Ohio 43040 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JAMIE UNGERER, Individually and in her | ) | |
| Official Capacity as Nurse at Creekview | ) | |
| Intermediate School | ) | |
| 212 Chestnut Street | ) | |
| Marysville, Ohio 43040 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JACKIE LEWIS, Individually and in her | ) | |
| Official Capacity as Nurse at Bunsold | ) | |
| Middle School | ) | |
| 212 Chestnut Street | ) | |
| Marysville, Ohio 43040 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DIANE ALLEN, Individually and | ) | |
| in her Official Capacity as Superintendent | ) | |
| of Marysville Exempted Village School | ) | |

District )
212 Chestnut Street )
Marysville, Ohio 43040 )
 )
and )
 )
TARA GILBERT, Individually and in her )
Official Capacity as Classroom Aide )
212 Chestnut Street )
Marysville, Ohio 43040 )
 )
and )
 )
JOHN ROES 1-5, Individually and in their )
Official Capacities as Employees of )
Marysville Exempted Village School )
District )
212 Chestnut Street )
Marysville, Ohio 43040 )
 )
Defendants. )

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**(Jury Trial Demanded)**

NOW COMES Plaintiffs, S.D. and T.D., as Parents and Legal Guardians of G.D., a minor, by and through undersigned counsel, and for their cause of action against the Defendants, Marysville Exempted Village School District Board of Education, Jamie Ungerer, Jackie Lewis, Diane Allen, Tara Gilbert, and John Roes 1-5, state the following:

**JURISDICTION**

1. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this matter presents a federal question under the Americans with Disability Act ("ADA") codified as 42 U.S.C. § 12182 *et seq.*, as well as the Fourteenth Amendment of the United States Constitution.

2

2.      Supplemental jurisdiction over Plaintiffs' state law claims is invoked pursuant to 28 U.S.C. § 1376 as the claims arise out of the same transaction and occurrences as Plaintiffs' federal claims.

3.      The events giving rise to this lawsuit occurred in Union County, Ohio, which is located in the Southern District of Ohio.

4.      Venue is proper in the United States District Court for the Southern District of Ohio, pursuant to 28 U.S.C. § 1391 (b)(2), as the events giving rise to Plaintiffs' claims occurred in this jurisdiction.

**PARTIES**

5.      At all relevant times, Plaintiff S.D. was an individual who resided in Union County, Ohio.

6.      At all relevant times, Plaintiff T.D. was an individual who resided in Union County, Ohio.

7.      Plaintiffs S.D. and T.D. are the natural and biological parents of G.D., a student at Marysville Exempted Village School District.

8.      Defendant Marysville Exempted Village School District Board of Education ("BOE") is, and was at all relevant times, the governing body for Marysville Exempted Village School District ("Marysville"). Pursuant to R.C. § 3313.17, "the board of education of each school district shall be a body politic and corporate, and, as such, capable of suing and being sued."

9.       Marysville is, and was at all times relevant herein, a public-school district incorporated under the laws of the State of Ohio, located in Union County, Ohio.

10.     Creekview Intermediate School is a school within Marysville Schools, serving grades 5-6.

3

11. Bunsold Middle School is a middle school within Marysville Schools, serving grades 7-8.

12. At all material times, G.D. was a student enrolled at Marysville.

13. At all material times, Defendant Jamie Ungerer, in her official capacity as Nurse at Creekview Intermediate School, was an agent and/or employee of Marysville, acting within the scope, course, and authority of her employment and/or agency and within the scope, course, and authority of her employer and/or agency.

14. At all material times, Defendant Jackie Lewis, in her official capacity as Nurse at Bunsold Middle School, was an agent and/or employee of Marysville, acting or failing to act within the scope, course, and authority of her employment and/or agency and within the scope, course, and authority of her employer and/or agency.

15. At all material times, Defendant Diane Allen, in her official capacity as Superintendent of Marysville, was an agent and/or employee of Marysville, acting or failing to act within the scope, course, and authority of her employment and/or agency and within the scope, course, and authority of her employer and/or agency.

16. At all material times, Defendant Tara Gilbert, in her official capacity as Classroom Aide, was an agent and/or employee of Marysville, acting within the scope, course, and authority of her employment and/or agency and within the scope, course, and authority of her employer and/or agency.

17. At all material times, Defendants John Roes 1-5, in their official capacities, were agents and/or employees of Marysville, acting or failing to act within the scope, course, and authority of their employment and/or agency and within the scope of, course, and authority of their employer and/or agency.

4

**FACTUAL ALLEGATIONS**

18. At all relevant times, G.D. had been diagnosed with several disabilities, including, but not limited to, selective mutism, mixed expressive receptive language disorder, and an articulation and phonological processing disorder.

19. As a result of these and other diagnoses, G.D. receives special education services through his Individualized Education Plan ("IEP") under the category of multiple disabilities.

20. As a result of these and other diagnoses, G.D. is mostly nonverbal, and thus, relies on other methods of communication in school.

21. G.D. receives occupational and speech therapy in school.

22. G.D.'s diagnoses substantially limit one or more of his major life activities, as set forth by the Americans with Disabilities Act ("ADA").

23. Due to his disabilities, G.D. has difficulty communicating and/or socializing with others.

24. G.D. was, at all relevant times, disabled due to these conditions.

25. In addition to his disabilities, G.D. suffers from extreme allergies, including dairy, wheat, and nuts.

26. In addition to his disabilities, G.D. is diagnosed with asthma.

27. As a result of G.D.'s allergies and asthma, G.D. had a Food Allergy & Anaphylaxis Emergency Care Plan and an Asthma Medical Action Plan.

28. At all relevant times, Marysville knew of, and was obligated to follow G.D.'s Food Allergy & Anaphylaxis Emergency Care Plan and his Asthma Medical Action Plan.

29. On March 24, 2023, an Evaluation Team Report was created by Marysville. In this report, it indicated that G.D. "has a medical history of extreme food allergies, wheat allergy was

reported to be capable of causing pulmonary edema and he had an Epi-Pen located at school as a result."

30.     The report further states, that G.D. had a "history of wheezing due to seasonal allergies and asthma-like symptoms. At the time, he was taking Singulair and Claritin. G.D. currently had a Medical Action Plan at school. Current medications include an Epi-Pen and Albuterol inhaler, which are kept in the school office."

31.     This Report was effective through March 23, 2026.

32.     As of March 1, 2024, G.D. had an IEP in place, which incorporated his Food Allergy & Anaphylaxis Emergency Care Plan and his Asthma Medical Action Plan.

### *May 8, 2024 Incident*

33.     During the 2023-2024 school year, G.D. was a student of Creekview Intermediate School.

34.     On May 8, 2024, G.D. was escorted to the nurse's office by his intervention specialist, Hunter Lobdell.

35.     At the time, G.D. was showing obvious signs of an asthma attack. These symptoms included a fever, red cheeks, and a clear mucus discharge from his nose.

36.     At the nurse's office, G.D. was examined by Jamie Ungerer, RN.

37.     As part of G.D.'s IEP and health plans, school personnel were required to provide care to G.D., including administering his inhaler, upon symptoms of an asthma attack.

38.     As a result of G.D.'s disabilities, he is unable to administer his inhaler himself or verbalize that he needs his inhaler.

39.     Despite G.D.'s symptoms, Ungerer refused to provide G.D. with his inhaler.

6

40. Ungerer claimed that she did not provide G.D. with his inhaler because he was not coughing upon arrival and "did not appear to be in distress."

41. Instead of providing G.D. with his inhaler, per the plan, Ungerer attempted to call G.D.'s parents several times over the next half hour.

42. She continued to withhold G.D.'s inhaler.

43. Eventually, G.D.'s grandfather went to pick-up G.D.

44. Prior to G.D.'s grandfather's arrival, G.D. began to cough. Still, Ungerer refused to provide G.D. with his inhaler.

45. When G.D.'s grandfather arrived, Ungerer offer G.D.'s grandfather the opportunity to administer the inhaler to G.D., but untrained in its usage or administration, G.D.'s grandfather told Ungerer he didn't know how to use it.

46. Ungerer sent G.D. home with his grandfather, without his inhaler, and without administering his inhaler prior to leaving.

47. G.D.'s grandfather is not part of his medical plan, nor was there any reason to believe that G.D.'s grandfather was equipped to administer G.D.'s inhaler, or in a position to assess whether G.D. needed his inhaler.

48. As a result of Ungerer's refusal to provide care to G.D., G.D. evaluated and treated at urgent care, where he underwent eight rounds of albuterol treatments.

49. After being discharged, S.D. requested the nurse's log, which Marysville refused to provide.

50. Additionally, S.D. sent an email to Ungerer, asking if she listened to G.D.'s lungs during this episode. Ungerer never responded.

7

51. On May 26, 2024, S.D. sent an email to the Board of Education, notifying the Board of the situation, and her concern that G.D.'s asthma plan was not followed.

52. In this email, S.D. also expressed her concerns that this incident was a result of G.D.'s disability, including his inability to communicate his symptoms.

53. S.D. never received a response.

### *October 21, 2024 Incident*

54. During the 2024-2025 school year, G.D. was a student of Bunsold Middle School.

55. At all relevant times, G.D. was a student in a multi-disability, and self-contained classroom.

56. G.D's Food Allergy & Anaphylaxis Emergency Care Plan in effect at the time contained a Medical Directive for Nutrition.

57. The Medical Directive for Nutrition form states, "please fill out this form in its entirety to ensure adequate care."

58. As part of G.D.'s medical directive, "all food will come from home or will need to be verified by parent in advance."

59. The medical directive indicated that G.D. was allergic to, among other things, wheat.

60. At all relevant times, Marysville knew that G.D.'s wheat allergy was severe and could lead to serious injury, including death.

61. Prior to the school year, Plaintiffs requested to meet with the school nurse, Jackie Lewis, to discuss the allergy plan. Lewis refused to meet with Plaintiffs, stating she was "too busy" to meet in person.

62.     On October 21, 2024, G.D. was given a cracker containing wheat by a classroom aide, Tara Gilbert. G.D. was given said cracker sometime between 10:55 a.m. and 11:59 a.m.

63.     During G.D.'s seventh period class, which began at 12:02 p.m., G.D.'s teacher noticed that G.D. was not participating in classroom activities. She also noted that G.D.'s eyes were watering. Recognizing a possible allergic reaction, a classroom aide escorted G.D. to the nurse's office.

64.     G.D.'s Food Allergy & Anaphylaxis Emergency Care Plan indicates that epinephrine must be given immediately if wheat was likely eaten, regardless of symptoms.

65.     G.D.'s Food Allergy & Anaphylaxis Emergency Care Plan also requires that epinephrine be given immediately if any severe symptoms are present, or if there is a combination of symptoms from different body areas.

66.     Due to G.D.'s inability to communicate with staff, his Food Allergy & Anaphylaxis Emergency Care Plan, as well as his IEP highlight the importance of recognizing physical symptoms and providing fast care.

67.     Upon G.D's arrival to the nurse's office, Lewis completed an assessment of him.

68.     As part of her initial assessment, she noted that G.D. was experiencing a runny nose, red cheeks, and that his throat was bothering him.

69.     The presence of these symptoms required that Lewis administer epinephrine immediately.

70.     Rather than administer epinephrine, Lewis attempted to call S.D. When S.D. did not answer, Lewis left the following voicemail at 12:24 p.m., "Hi Sarah, this is Jackie, the nurse over at Bunsold Middle School. So, [G.D.] is down here. He is definitely having a reaction to

9

something. His nose is runny, and his cheeks are red and his throat is bothering him. So if you could give me a call back at [number omitted], thank you."

71. Despite recognizing that G.D. was experiencing an allergic reaction, and despite his allergy plan requiring her to do so, Lewis failed to administer epinephrine.

72. Lewis also failed to contact 911, as stated in G.D's allergy plan.

73. At 12:35 p.m., Lewis wrote in her nurse's log, "student brought into clinic with class Aid, face bright red, eyes watering and nose running, student has wheat allergy, and appeared to be having an allergic reaction, student is nonverbal and responds only to yes/no questions by touching que words, student cue yes when ask if throat hurting, Spo2 95% audible wheezing noted after arriving at clinic, Stridor noted when assessing lung sounds, RR 22, Student cue "yes" to body itching and feeling hot. Aid stayed with student for support."

74. Again, Lewis took no action after entering the above information into her log, despite noting multiple symptoms across G.D.'s body, in violation of the allergy plan.

75. At 12:39 p.m., Lewis again tried to call S.D.

76. At 12:40 p.m., more than 30 minutes after Lewis first noted severe symptoms, Lewis finally administered epinephrine and called 911.

77. G.D. was transported to the hospital by paramedics, where he was treated for anaphylaxis.

78. Following the October 21, 2024, incident, G.D. did not return to his baseline health status.

79. That same evening, S.D. requested that Marysville conduct an investigation into how G.D. was given a wheat cracker, and why treatment was delayed. Despite asking on several occasions, Marysville refused to provide Plaintiffs with an answer to either question.

80. In the days following October 21, 2024, G.D. suffered from residual symptoms, including a swollen face and redness.

81. During this time, G.D. was kept home from school, per the doctor's recommendation, hoping to return to a stable condition.

82. On October 27, 2024, G.D. was found unresponsive in his home. G.D. was blue, not breathing, and without a heartbeat.

83. Plaintiffs quickly administered epinephrine, reviving G.D. He was transported to the hospital, where he remained for two days.

84. On October 30, 2024, Marysville sent an email to Plaintiffs, wherein they denied that G.D. was given a wheat cracker and claimed that the nurse adhered to the allergy plan. Instead, the school blamed the possibility of wheat entering through a classroom window as explanation.

85. On that same day, Emily Curnette, a teacher at Bunsold Middle School, sent an email to her students' families, including G.D., with the subject line: "Apologies/Unfortunate News."

86. In this email, Curnette wrote, "Good afternoon, families! I am sending this email with some unfortunate news. In past years, I have done the movie/snack days with no issue. However, this year, things are a little different, and I have been advised by the administration to not serve any type of food in the classroom for any type of party, movie, etc. If you have already purchased something or brought it in, I am so sorry for any inconvenience. I will send your student back with the things you have donated tomorrow. If you have not yet purchased what you planned to bring, please do not purchase anything. Again, I am very sorry to anyone for any inconvenience this caused, and I hope that you understand this is to protect students, first and foremost. We will still be viewing the movie tomorrow and Friday in class, so it will be a relaxing end to the week

11

for your students. Let me know if you have any questions or concerns and thank you for your understanding and support. Emily"

87. Since the incidents described herein, G.D. has become more detached, fearful of going to school or activities that do not involve his parents, and fearful of non-family adults.

**COUNT I:**
**Violation of ADA**
**(Against Marysville)**

88. Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten and replead herein and further state as follows.

89. Marysville is bound by the obligations imposed by the Americans with Disabilities Act ("ADA").

90. The ADA prohibits discrimination based on disability.

91. Under 42 U.S.C. § 12132, G.D. is protected as a person with a disability and is entitled to protections under 20 U.S.C. § 1415 to bring a claim or cause of action under the provisions of the Act.

92. Marysville violated provisions of the ADA by its acts and/or omissions, including, but not limited to,

    a. 28 C.F.R. § 35.130(a), which provides that "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity;"

    b. 28 C.F.R. § 35.130(b)(i), which prohibits a public entity from "deny[ing] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service [of the public entity];"

c. 28 C.F.R. § 35.130(b)(iii), which prohibits a public entity from providing a "qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;"

d. 28 C.F.R. § 35.130(b)(vii) which prohibits a public entity from "otherwise limit[ing] a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service;" and

e. 28 C.F.R. §35.130(b)(3)(i), by using "criteria or methods of administration" that have "the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."

93. At all relevant times, Defendant was notified and aware of G.D.'s disability.

94. Marysville discriminated against G.D. when it, among other things, gave him a wheat cracker, a direct violation of his allergy plan.

95. Marysville discriminated against G.D. when it, among other things, failed to render appropriate aid to G.D. because of his disability, leading to injury.

96. Due to Defendant's conduct, G.D. has been, among other things, excluded from participation in or be denied the benefits of Marysville, and/or been subjected to discrimination by Marysville.

97. G.D.'s claims of discrimination do not relate to G.D.'s ongoing right to receive a free public education and thus is not subject to any administrative exhaustion requirement.

98. Marysville was made aware of the aforementioned violations, and acted with deliberate indifference when it attempted to cover up the violations in the days that proceeded.

99. As a direct and proximate result of Defendant's violations of the ADA, G.D. suffered damages and continues to suffer damages.

100. As a direct and proximate result of Defendant's violations of ADA, G.D. was deprived of access to education opportunities. Plaintiffs are entitled to monetary and injunctive relief.

**COUNT II:**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**(Against Marysville)**

101. Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

102. Section 504 of the Rehabilitation Act of 1973 provides, in pertinent part, that: "No otherwise qualified individual with handicaps in the United States . . . shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."

103. As described herein, G.D. is an otherwise qualified individual with handicaps as pursuant to Section 504.

104. G.D. had a record of such handicaps, which were known by Defendant.

105. As described herein, G.D. was excluded from and/or denied the benefit of Marysville's educational programming, solely by reason of his handicap.

106. G.D.'s claims under Count II do not relate to G.D.'s ongoing right to receive a free public education and thus is not subject to any administrative exhaustion requirement.

107. Marysville was made aware of the aforementioned violations, and acted with deliberate indifference when it attempted to cover up the violations in the days that proceeded. This coverup included hiding the truth of what occurred to G.D. from Plaintiffs.

108. As a direct and proximate result of Defendant's violations of Section 504 of the Rehabilitation Act, G.D. suffered damages and continues to suffer damages.

## COUNT III:
### Denial of Due Process
### 42 U.S.C. § 1983, Fifth and Fourteenth Amendments to the United States Constitution
### (Against All Individual Defendants, in their Individual Capacities)

109. Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

110. Defendants' failure to train and supervise Ungerer, Lewis, and Gilbert, as well as their failure to protect G.D. from Ungerer, Lewis, and Gilbert deprived him of his liberty interest in bodily integrity, and his property interest in an education, without due process of law, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.

111. Defendants subjected G.D. to violations of his liberty interest in bodily integrity, and his property interest in his education by failing to adequately supervise and train Ungerer and Lewis, all of which created the danger that resulted in G.D. being subjected to a medical emergency and injury more severely and for a longer period of time than otherwise would have been the case.

112. At all relevant times, Defendants were acting within the scope of their respective employment and/or agency.

113. As a direct and proximate result of Defendants' conduct contained herein, G.D. suffered damages and continues to suffer damages.

## COUNT IV:
### State Created Danger
### 42 U.S.C. § 1983
### (Against All Individual Defendants, in their Individual Capacities)

114. Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

15

115.    Defendants have, under color of law, deprived G.D. of rights, privileges, and immunities secured to him by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically the right to be free from affirmative actions that directly increase G.D.'s vulnerability or otherwise place him in danger and take away from his parents their ability to protect him.

116.    Defendants acted with deliberate indifference when, despite a clear and known risk to G.D. if he was exposed to wheat, provided G.D. with a wheat cracker for his own consumption.

117.    Defendants acted with deliberate indifference when, despite several signs of respiratory and other distress, Ungerer and Lewis refused to intervene, refused to follow his plan of care, and refused to provide appropriate medical attention. Such acts placed G.D. in danger and/or made him more vulnerable to danger.

118.    At all relevant times, Defendants were acting within the scope of their respective employment and/or agency.

119.    Defendants' denial of G.D.'s constitutional rights caused G.D. pain and suffering, including, but not limited to, humiliation, depression, educational impacts, anxiety, and fear.

120.    As a direct and proximate result of Defendants' actions, G.D. suffered damages and continue to suffer damages for which they are liable.

**COUNT V:**
***Monell* Liability for Violation of 42 U.S.C. § 1983**
**(Against Marysville)**

121.    Plaintiffs incorporate all previous paragraphs and allegation as if fully rewritten and replead herein and further states as follows.

122.    Defendants were state actors working for Marysville, which is a federally funded school system.

16

123. Defendants acted under color of law when they were confronted with G.D. showing various signs and symptoms of respiratory distress and refused to provide appropriate medical attention.

124. The Defendants knew, or should have known, that they had a duty to respond to G.D.'s medical emergencies in accordance with his medical and allergy plan.

125. Defendants' failure to render appropriate aid to Plaintiff violated Plaintiff's rights to due process, as contained herein, and amounted to affirmative actions that directly increased G.D.'s vulnerability or otherwise placed him in danger and took away from his parents their ability to protect him. .

126. Defendants' failure to act amounts to an official policy of inaction by Marysville.

127. Marysville's official policy of inaction caused Plaintiff to suffer deprivation of her constitutional rights to due process.

128. Marysville's official policy of inaction caused Plaintiff pain and suffering including, but not limited to, humiliation, depression, educational impacts, anxiety, and fear.

129. As a direct and proximate result of Defendants' violations, Plaintiff suffered damages and continue to suffer damages.

### COUNT VI:
### Negligence
### (Against Marysville, and All Individual Defendants, in their Individual Capacities)

130. Plaintiffs incorporate all previous paragraphs and allegations as if fully rewritten herein.

131. Defendants had an affirmative duty to care for and protect G.D., which included the duty to follow agreed upon health and safety plans and provide medical attention as required.

132.    Despite these duties, Defendants failed to train, supervise, implement health plans, and provide necessary medical care.

133.    Defendants breached this duty when a staff member was permitted to provide G.D. with a wheat cracker, in violation of his allergy plan.

134.    Defendants breached this duty when it failed to provide necessary medical attention on two separate occasions, despite clear signs of distress.

135.    Defendants' acts and omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.

136.    As a direct and proximate cause of Defendants' negligence, G.D. suffered damages and continues to suffer damages.

### COUNT VII:
### Loss of Consortium
### (Against All Defendants)

137.    Plaintiffs adopt and incorporate all previous paragraphs and allegations as if fully rewritten herein.

138.    As a result of the wrongful acts of Defendants, contained herein, S.D. and T.D. were caused to suffer, and will continue to suffer, loss of consortium, loss of society, affection, assistance, and parental fellowship of her son.

139.    All damages contained above were directly and proximately caused by the wrongful acts of Defendants.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues triable by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A.  Award Plaintiffs compensatory damages in an amount to be shown at trial;

B.  Award Plaintiffs punitive damages in an amount to be shown at trial;

C.  Award Plaintiffs reasonable attorneys' fees, costs, and disbursements;

D.  Award Pre and post judgement interest; and

E.  Grant Plaintiffs such additional relief as the Court deems just a proper.

Respectfully Submitted,

*/s/ Eric Long*
Eric F. Long (0093197)
Tyler J. Walchanowicz (0100115)
Friedman Nemecek Long & Grant, L.L.C.
The IMG Center
1360 E. 9th Street, Suite 650
Cleveland, OH 44114
T: (216) 928-7700
F: (216) 820-4659
efl@fanlegal.com
tjw@fanlegal.com

*/s/ Ruth Pack-Adler*
Ruth Pack-Adler, Esq. (0067446)
Abdnour Weiker, LLP
262 South 3rd Street
Columbus, Ohio 43215
Office: (614) 745-2001
ruth@awlawohio.com